UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRYSTEN C., <br><br> Plaintiff, <br><br> v. <br><br> BLUE SHIELD OF CALIFORNIA, <br><br> Defendant. | Case No. 15-cv-02421-RS <br><br> **ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

In this action brought under ERISA, 29 U.S.C. § 1132(a)(1)(B), plaintiff Krysten C. challenges defendant's determination that residential treatment for her anorexia nervosa and related physical conditions was no longer "medically necessary" after she had received sixty days of such treatment at the Monte Nido center in southern California. Upon consideration of the parties' cross-motions for summary judgment, the record supports a conclusion that defendant did not abuse the discretion it undisputedly held under Kyrsten's benefit plan to determine that continued treatment in a residential program was not medically necessary, and therefore it was not required to continue paying for such treatment. Judgment will therefore be entered in defendant's favor.

## II. BACKGROUND

Krysten is a 29-year old woman who alleges she has suffered from anorexia nervosa, major depressive disorder, and anxiety disorder since age 14. There is no dispute that as of April of 2014, her weight dropped to 60 lbs. and she was unable to walk. She was hospitalized in Colorado for inpatient treatment of severe malnutrition and life-threatening electrolyte abnormalities resulting from her eating disorder.

On June 30, 2014, Krysten was admitted to Monte Nido for residential treatment. At admission, she presented with medical complications including osteopenia, amenorrhea, hypokalemia (low potassium), shortness of breath, chest tightness, and gastroparesis. Krysten is a covered beneficiary under an employee welfare benefit plan regulated by ERISA issued and administered by defendant Blue Shield of California. Blue Shield initially approved benefits for Plaintiff's residential treatment.[1]

After approximately six weeks, Blue Shield reevaluated the circumstances. Blue Shield physician, Dr. Jorge Zapatel, a board-certified psychiatrist, consulted with Krysten's treating physician on August 22, 2014 and reviewed her medical records. Krysten's weight had increased to 110.2 lbs., which was 83% of her ideal body weight.[2] Given her progress during the previous six weeks of treatment, Dr. Zapatel found Krysten no longer required the residential level of care for her anorexia. Dr. Zapatel, however, approved coverage through August 29, 2014 so that she could transition to a lower level of care.

On the day he had determined coverage should end, Dr. Zapatel reviewed additional medical records and again concluded Krysten no longer required 24/7 residential care. Zapatel wrote "[t]he reason for the request of continued ED RTC is that 'it's a long weekend' and because the member's ex-boyfriend is coming to visit. The provider could have planned the

---

[1] Blue Shield contracts with Magellan Health Services to underwrite and coordinate coverage for mental health services. There is no indication, however, that any technical distinction that might be drawn between Magellan and Blue Shield impacts the analysis in this order. For convenience, the name "Blue Shield" will be used to include Magellan acting on Blue Shield's behalf.

[2] There is some dispute as to Krysten's height, and therefore as to the precise percentages. There is no indication, however, that Blue Shield intentionally or negligently misstated Krysten's height.

discharge in a timely manner to coincide with medical necessity. The member has access to a lower level of care and has a place to live."

Krysten then appealed Blue Shield's coverage decision. Dr. Thomas Carlton, another board-certified psychiatrist, reviewed her medical records. Dr. Carlton found there was no evidence that Krysten required the 24/7 supervision of residential treatment. He wrote: "The member is at normal weight. Anorexic thoughts and impulses have been reported, but no severe eating disordered behavior has been reported for some time. There are some minor physiologic changes, including some pulse increase on standing, but none of this appears to currently threaten the health of the member. There is no clarity regarding the treatment plan, and there is no evidence of serious discharge planning for the past 2 months."

Dr. Carlton also noted that he was missing certain clinical records from Monte Nido. Accordingly, Blue Shield denied the appeal based on the lack of records but notified Krysten it would reconsider her claims if additional records were submitted: "[I]f your provider submits your clinical medical records, which include your admission history and physical exam as well as all daily clinical notes from June 30, 2014 through September 3, 2014, to Blue Shield; then your request for coverage of treatment at a residential level of care will be reconsidered."

Monte Nido then submitted additional medical records. Dr. Carlton reviewed the claim again in light of the new records and wrote: "After reviewing the documents submitted by the facility, my recommendation remains unchanged from my original recommendation." He concluded Krysten did not require the 24/7 supervision of residential treatment for her anorexia and could step down to a lower level of care.

Blue Shield also solicited a review from a physician not associated with the company. In that review, Dr. Karam Radwan, another board-certified psychiatrist, employed by third-party Prest & Associates (retained by Blue Cross) concluded, "[t]he patient is currently around 84% of her ideal body weight." "[T]he patient has been compliant with her treatment. She has been eating her meals …. She was evaluated by a cardiologist and her heart condition appeared to be stable …. The patient currently does not have any severe comorbid acute medical conditions that cannot be treated in a less restrictive setting."

1    Blue Shield ultimately approved treatment for only 60 days (through August 29, 2014).
2    Blue Shield and its mental health services administrator, however, both issued payments to Monte
3    Nido, with the result that total of $79,778 was reimbursed, representing 79 days of treatment
4    (through September 17, 2014). Accordingly, the only benefits at issue relates to the 24 days of
5    treatment Krysten received between September 17th and October 13, 2014, a total of $29,945.

## III. DISCUSSION

### A. Standing

On the eve of the hearing in this matter, Blue Cross submitted a brief arguing that Krysten lacks constitutional and statutory standing to pursue the claims she has brought, given a lack of evidence she paid Monte Nido the sums in dispute and given Monte Nido allegedly is barred by its contract with Magellan (Blue Shield's agent) from seeking recovery directly from Krysten. Because jurisdictional defects are not subject to waiver, the failure of Blue Cross to raise these issues in a more timely manner is not dispositive.

Krysten has adequately alleged Monte Nido contends she is responsible for the unpaid bill. Accordingly, there is a sufficient "case or controversy" to support constitutional standing, even in the event Monte Nido's claim ultimately can be shown to lack legal merit. Furthermore, both of the cases Blue Cross relies upon to argue Krysten lacks statutory standing under ERISA were decided on the merits, and not on jurisdictional standing grounds. *See*, *LaRocca v. Borden, Inc.,* 276 F.3d 22, 31 (1st Cir. 2002); *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 242 (6th Cir. 1995). Accordingly, there is no basis to dismiss this action for lack of standing. That said, if Monte Nido in fact is asserting a right to collect from Krysten, at this juncture it likely is incumbent on Blue Cross/Magellan to intervene on her behalf to assert the position it has taken in this litigation, and to protect her interests in that regard, notwithstanding the other conclusions of this order.

B. Procedural Status

At the initial Case Management Conference in this matter, it was set for a "bench trial" on August 29, 2016. Shortly thereafter, Blue Cross filed a motion for summary judgment, setting a hearing date in late June. Because review in ERISA cases like this typically is limited to the administrative record, "bench trials" often closely resemble cross-motions for summary judgment. An order therefore issued vacating the June hearing date, setting a briefing schedule for cross-summary judgment motions, and inviting both sides to set out any issues that they might contend potentially could be resolved only under the rubric of a "bench trial" rather than by "summary judgment."

Blue Cross subsequently filed a brief arguing that the case can indeed be decided on summary judgment, although it pointed out that "the normal rules of summary judgment do not apply." *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999) ("Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.") For her part, although Krysten argues that the parties have disputes regarding the facts, she does not argue the case should not be decided based on the papers submitted and oral argument. Neither party suggests some other form of "bench trial" must be held, such as any proceeding involving live witness testimony. Accordingly, the issue appears to be more of nomenclature than substance. Whether denominated as a "bench trial" or as merely oral argument on cross-motions for summary judgment, the hearing held on August 29, 2016, the briefing, and the record submitted, provide the basis of this decision.

C. Standard of Review

The parties are in agreement that the benefit plan at issue here vests Blue Cross with "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," and that therefore the Court reviews the determination for abuse of discretion. *See Montour v.*

*Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009). Krysten argues, however, that as *Montour* teaches, "[a]pplication of the abuse of discretion standard . . . requires a more complex analysis," where "the same entity that funds an ERISA benefits plan also evaluates claims," which is the case here. *Id.*

Thus, the court is to take into account "the extent to which a conflict of interest appears to have motivated an administrator's decision," but only as "one among potentially many relevant factors that must be considered." *Id.* at 630. The degree to which a conflict may have "tainted" the decision-making should evaluated in light of what all "the facts and circumstances indicate." *Id.* at 631.

### D. Record objections

In support of its motion, Blue Cross submitted what it contends is the complete administrative record.[3] Krysten does not dispute the completeness of those materials. In support of her opposition, however, she offers the declaration of a Monte Nido employee asserting the facility had a waiting list, and therefore lacked any economic motive to treat Krysten after Blue Cross denied continued benefits. Blue Cross contends this declaration—not part of the administrative record—is inadmissible. Krysten, however, offered the declaration only in response to Blue Cross's insinuation that Monte Nido's evaluation of Krysten's ongoing need for residential treatment perhaps should be treated with suspicion. Blue Cross was free to make that argument—which also goes beyond the administrative record—and Krysten was free to offer the declaration in rebuttal. In both instances the advocacy will be treated as such, and ultimately does not affect the analysis under the standard of review on the administrative record.

Blue Cross also objects to Krysten's citation to practice guidelines that were published online in 2006 by the American Psychiatric Association regarding the treatment of eating disorders. Blue Cross contends the guidelines also represent inadmissible "extrinsic evidence,"

---

[3] In light of Krysten's privacy interests in her medical records, the motion to seal that administrative record is granted.

outside the administrative record. Although Krysten did not present the guidelines as "evidence" *per se*, Blue Cross has adequately explained why they should not be taken as governing or dispositive here.

Finally, after briefing was complete, Blue Cross submitted an application for leave to file a "surreply" to "correct factual errors."[4] In response, Krysten filed another declaration offering evidence outside the administrative record. While Krysten is free to argue that Blue Cross should have requested other or additional materials from her or from Monte Nido, she has made no showing of extraordinary circumstances that would warrant direct consideration of documents outside the administrative record. The motion to file a surreply will be denied, and the subsequent declaration disregarded. The parties' respective claims of "factual errors" represent ordinary disputes regarding characterizations of the record that do not warrant post-briefing submissions.

E. Analysis

Blue Cross's proffered showing in support of its contention that it did not abuse its discretion is simple—and ultimately compelling. Blue Cross ultimately authorized 60 days of residential treatment (and inadvertently paid for 79). It gave a week's notice prior to terminating coverage, for the express purpose of allowing Krysten and her heath care providers at Monte Nido to prepare her to transition to a lower level of care. The three psychiatrists on which it relied, including one outside consultant, all agreed that by August 29, 2014, Krysten did not require the 24/7 supervision of residential treatment for her eating disorder.

Of great significance is the fact that Blue Cross, and the physicians it consulted, never took the position that Krysten was fully recovered, or did not require ongoing care. Indeed, the recommendation was that Blue Cross continue providing benefits—at the next lower level of care,

---

[4] Although inaccurately labeled as an "*ex parte*" application, it was e-filed and therefore served through the ECF system. As such, it did not violate Civil Local Rule 7-10 ("a party may file an ex parte motion, that is, a motion filed without notice to opposing party, only if a statute, Federal Rule, local rule or Standing Order authorizes the filing of an ex parte motion in the circumstances.")

known as "partial hospital treatment."[5]  Krysten's challenge to Blue Cross's decision rests primarily on evidence she can point to showing that she was still suffering from eating disorder, and still at risk for relapse.   Indeed, the record very plainly establishes that ongoing treatment was medically necessary.  What Krysten has not shown, and largely has not even addressed, however, is why it is an abuse of discretion for Blue Cross to conclude that *residential*  treatment was no longer medically necessary.

Krysten also argues that Blue Cross did not appropriately process her appeals after August 29, 2014.  As noted, Blue Cross had advised her a week earlier that coverage would terminate on that day.  After business hours on Friday, the 29th, Krysten's therapist at Monte Nido telephoned Blue Cross to request an expedited appeal.  Dr. Carlton asserts he and a claims representative then made "at least eight" telephone calls back to Monte Nido that night, but when he could not get through, he processed the appeal.  Krysten argues the documents fail to establish quite that many calls.  She also faults Dr. Carlton and Blue Cross for expecting to reach anyone after hours on the Labor Day weekend—even though that is when the expedited appeal was requested.  In any event, Blue Cross initially denied the appeal for lack of adequate records—but expressly allowed Krysten and Monte Nido to submit those records thereafter.

Krysten appears to be arguing that Blue Cross never genuinely or fairly reexamined its initial decision to cut off residential treatment as of August 29th.  As set out above, however, Drs. Zapatel, Carlton, and Radwan all reached the same conclusion after multiple reviews of the record.  Again, while Krysten points to much evidence that she remained in need of treatment at some level, she has not shown why any of the doctors should have reached a different result on appeal.

Even in light of its conflict as the entity that both evaluates and funds claims, Blue Cross is

---

[5]   The record does not indicate what the daily cost differential between residential treatment and partial hospital treatment would have been.  Presumably the savings to Blue Cross would have been more than *de minimis*.  Nevertheless, the fact that Blue Cross was not attempting to avoid all financial responsibility, the fact that it consulted with third-party evaluators, and the absence of any other strong indicators that its coverage decision was "tainted" by the conflict of interest, all warrant assigning little weight to that factor.

entitled to exercise discretion in determining eligibility for benefits.  Here, it has adequately shown that it exercised that discretion in a reasonable manner by relying on the opinions of the three physicians that Krysten had progressed to a point that residential treatment for her condition was no longer medically necessary.  Krysten has shown she was still in need of treatment, but has pointed to nothing in the record sufficient to establish that only residential treatment would have been adequate for her medical needs.

IV.  CONCLUSION

Blue Cross's motion for summary judgment is granted, and Krysten's cross-motion is denied.  A separate judgment will enter.

**IT IS SO ORDERED**.

Dated: October 11, 2016

RICHARD SEEBORG
United States District Judge